**Edward Earl JOHNSON, Petitioner,**

v.

**Morris THIGPEN, Commissioner, Mississippi Department of Corrections, Defendant.**

**Civ. A. No. J84–0501(B).**

United States District Court,
S.D. Mississippi,
Jackson Division.

Dec. 13, 1985.

Barry Powell, R. Jess Brown, Jackson, Miss., for petitioner.

William S. Boyd, III, Sp. Counsel, White & Morse, Gulfport, Miss., for defendant.

## MEMORANDUM OPINION AND ORDER

BARBOUR, District Judge.

Petitioner Edward Earl Johnson, a black man, was convicted in 1980 in the Circuit Court of Leake County, Mississippi, of the capital murder of Town Marshal J.T. Trest, a white man, at a time when Trest was performing official duties as a law enforcement officer. At a subsequent sentencing hearing pursuant to Mississippi's bifurcated scheme, a jury imposed a sentence of death. On direct appeal, the Mississippi Supreme Court affirmed Petitioner's conviction and the imposition of the death penalty in his case. *Johnson v. State,* 416 So.2d 383 (Miss.1982). After a request for rehearing by the Mississippi Supreme Court was denied, and an initial petition for federal habeas corpus relief was dismissed without prejudice, Petitioner's application for leave to file petition for writ of error coram nobis was denied by the Mississippi Supreme Court. *Johnson v. Thigpen,* 449 So.2d 1207 (Miss.1983). In June 1984, the instant petition for federal habeas relief pursuant to 28 U.S.C. § 2254 was filed, and this Court issued a stay of execution in order to consider the habeas petition. The State has moved to dismiss the petition and attacks the various grounds as lacking in merit or as procedurally barred under the circumstances.

The basic facts surrounding the capital murder and incidents related thereto are reported in the Mississippi Supreme Court opinion on direct appeal, 416 So.2d at 384–386. These facts, along with other testimony appearing in the trial record, will only be summarized here.

At approximately 2:00 to 3:00 A.M. on June 2, 1979, Sally Franklin, an elderly resident of Walnut Grove, Mississippi, was awakened by a knock on the door of her home. Franklin discovered an individual on her porch who would identify himself only as "Fred Smith." This individual represented to Franklin that he was there to pay the bill of another individual for cosmetic products, which Franklin sold to members of the community. While Franklin was in another portion of her home tending to the requested transaction, the individual broke into the house through a window. According to Franklin's testimony, the intruder grabbed her and announced sexual intentions. A struggle ensued, and Franklin offered to give her assailant money if he would spare her life. Franklin tried to escape but was ultimately knocked unconscious. The disturbance caused a boarder in Franklin's home to investigate, which caused the intruder to flee. During this same time frame, neighbors heard gunshots and proceeded to the Franklin residence. Shortly thereafter, these neighbors discovered the body of Town Marshal J.T. Trest lying in front of his patrol car. The patrol car was parked a short distance from Franklin's home with the driver's door still open, the engine running, and the headlights illuminated. Officer Trest's .357 handgun was missing. A .25 caliber automatic was found near his body.

Franklin subsequently identified for police, and identified at trial, the Petitioner as her assailant. Other observers placed a vehicle like that owned by the Petitioner at the scene of the crime at the time in question; moreover, Petitioner had been seen, a week prior to the crime, in possession of a .25 caliber automatic like that found near Trest.

Petitioner was later apprehended and gave police a statement in which he admitted the break-in at Franklin's home and the murder of Officer Trest. This confession indicated that subsequent to his struggle with Sally Franklin, which was interrupted by Franklin's boarder, Petitioner ran to his car. In pertinent part, Petitioner stated in his confession that:

The police come around the corner of the old bank building from the south. In a police car. He stopped and opened the door of the police car and started to get out. He said what are you doing, Bud? I said nothing at the time. I said that and reached over and get my gun out of the car pocket and put a shell in the barrel. Then the police shined his light in my car. I then jumped out of my car. And I shot him 2 times with my .25 automatic. I was about 4 foot from him. He slowly fell to the ground of his car fender. He was moving on the ground and moaning. I ... grabbed his gun. Also before he fell to the ground I hit him in the forehead with my gun and my gun flew out of my hand and then I grabbed the polices gun and shot him 2 times. In the head.

Subsequent to his conviction for the murder of Trest under *Miss. Code Ann.* § 97–3–19(2)(a), which defines the murder of a peace officer who is acting in his official capacity as capital murder, the Petitioner was sentenced to death in a second phase hearing. The jury found that two statutory aggravating circumstances existed, i.e., that the murder was committed while the Defendant was in flight from the crime of burglary and attempted rape, and that the murder was "especially heinous, atrocious and cruel," *Miss. Code Ann.* § 99–19–101(5)(d) and (h). The jury was instructed as to mitigating circumstances, but determined that the aggravating circumstances outweighed the mitigating circumstances and returned a verdict of death.

In its current posture, the Petition before the Court alleges nine separate grounds on which federal habeas relief ought to be issued. These alleged constitutional errors

in the state court proceedings are directed primarily, though not exclusively, toward the sentencing phase of the trial. Specifically, the Petitioner alleges the following asserted constitutional errors, failures, or omissions by the state trial court: (1) a limitation of oral argument by counsel for Petitioner at the sentencing phase; (2) the failure to give a lesser included offense instruction for manslaughter at the guilt phase; (3) alleged discrimination in the selection of members of the grand jury and the foreman of the grand jury; (4) the lack of prior notice by the prosecutor of the aggravating circumstances upon which he would rely in the sentencing phase; (5) the denial of an instruction stating that the jury must presume that the Petitioner would stay in prison the rest of his life if sentenced to life imprisonment; (6) the overbreadth of the terms "heinous, atrocious, or cruel" as a statutory aggravating circumstance and a failure to define same in an instruction given to the jury; (7) the alleged discriminatory imposition of the death penalty on blacks convicted of the homicide of whites; (8) an "arbitrary" distinction between the punishments available for felony murder and for simple premeditated murder; and (9) a failure to instruct the jury adequately in the sentencing phase with regard to the statutory aggravating circumstance of whether Petitioner was in flight after committing the crime of burglary or attempted rape.

In considering the instant petition, the Court has had the benefit of, and has reviewed, the record of the state trial court and appellate proceedings, as well as the various briefs of the parties submitted to the Court regarding habeas relief. In this regard, we have endeavored, as is our duty in death penalty cases, to give careful scrutiny to any colorable claim of fundamental constitutional error, *Zant v. Stephens*, 462 U.S. 862, 884–85, 103 S.Ct. 2733, 2746–47, 77 L.Ed.2d 235, 254–55 (1983). We are further mindful, however, of the Supreme Court's admonition that federal habeas proceedings play a secondary and limited role in assuring the observance of constitutional rights and that "federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391, 77 L.Ed.2d 1090, 1100 (1983). We further observe that the procedural posture of claims presented in federal court may serve as an important limitation on habeas review. *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

In this context, the state has vigorously asserted a procedural default and failure to preserve error in the state courts as to a number of claims presented in the instant petition. Since it is apparent to the Court that the individual claims contained in the petition vary in their procedural history, the issue of default is addressed separately with our discussion of each separate claim as may be appropriate. In this context, however, a brief explanation of this Court's decision in *Edwards v. Thigpen*, 595 F.Supp. 1271 (S.D.Miss.1984) may prove helpful. *Edwards* was decided while briefing in the instant case was still under way.

In *Edwards*, this Court specifically refused to apply retroactively a procedural bar invoked by the Mississippi Supreme Court on a post-conviction error coram nobis petition for issues not raised on direct appeal to that court. The underpinning of our decision may be briefly summarized. In our view, prior to its decision in *Edwards v. Thigpen*, 433 So.2d 906 (Miss. 1983), the Mississippi Supreme Court had with some consistency addressed the merits of death penalty cases on petitions for error coram nobis without regard as to whether the issues under consideration had been raised on direct appeal. In essence, the state court had permitted on the merits both a primary appeal (the direct appeal) and also a secondary appeal (error coram nobis). The state court decision in *Edwards, supra,* announced what this Court viewed as a new policy of strict application of procedural default rules on error coram nobis. However, at the time of the direct appeal there, the new rule had not been announced, and the attorney for Petitioner might reasonably have relied on the then existing "two appeal" procedure by advancing some errors on direct appeal and with-

holding others for subsequent assertion on error coram nobis. The retroactive application of the new procedural default rule under these circumstances to bar habeas corpus review of the merits of those claims not asserted on direct appeal but advanced on error coram nobis would have unjustly penalized the Petitioner. *See* 595 F.Supp. at 1277–79.

Our holding in *Edwards* is of limited prospective applicability. First, by its terms it is limited to a class of cases wherein the direct appeal to the Mississippi Supreme Court was taken prior to the March 23, 1983, decision of the Mississippi Supreme Court in *Edwards v. Thigpen*, 433 So.2d 906 (1983). In the instant case, Petitioner's assignment of errors and brief on direct appeal were filed in 1981. Accordingly, the instant petition is at least initially subject to our holding in *Edwards*.

A second and major limitation upon our holding in *Edwards* is that the procedural defaults to which the Court's attention was directed were *on direct appeal*, and not at the trial court level. We specifically noted that "at the trial of Edwards his attorney made timely objections to almost every conceivable error." 595 F.Supp. at 1271. Thus, our holding in *Edwards* may not be simply read for the proposition that this Court will ignore on habeas review defaults which have occurred at trial through the failure to make appropriate contemporaneous objections or requests of the trial judge. The requirement that possible error be preserved and corrected at trial serves important interests generally recognized both in the state system, *see Newell v. State*, 308 So.2d 71 (Miss.1975) and Mississippi Supreme Court Rule 42, and also upon federal habeas review, *see Engle*, 456 U.S. at 127–29, 102 S.Ct. at 1571–72. Accordingly, our holding in *Edwards* does not extend to a default occurring at trial and on appeal, and the procedural bar will be enforced where appropriate. In this context, we further observe that an occasional exercise of discretion by a state court in reaching the merits of a claim which might be barred by the contemporaneous objection rule does not require this Court to disregard that rule in all cases. *Bass v. Estelle*, 705 F.2d 121 (5th Cir.1983). If the state court has reached the merits in spite of the procedural default, of course, so will this Court on habeas review. *Engle*, 456 U.S. at 135 n. 44, 102 S.Ct. at 1575 n. 44.

With the foregoing in mind, we address separately each claim asserted by Petitioner as grounds for habeas relief.

1. *Limitation of Argument of Defense Counsel in Sentencing Phase.*

The Petitioner makes no claim in this case that the prosecutor, in closing argument to the jury in the sentencing phase, made comments so prejudicial and unfair as to render his sentence of death constitutionally defective. *See, e.g., Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir.1984). Instead, the Petitioner contends that by sustaining several of the State's objections to portions of the closing arguments of defense counsel, his right for the jury to consider factors in mitigation of the death penalty was denied. Relying upon *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), he specifically contends that "if a state may not constitutionally limit the circumstances or factors that may be considered in mitigation of a possible death sentence, then likewise a state cannot constitutionally limit the final argument of defense counsel on the circumstances or factors that may be considered in mitigation of a possible death sentence."

The state trial record of the closing argument of defense counsel [R.2054–2080] reveals that several of the state's objections to various portions of the argument were sustained. Specifically, objections were sustained to defense counsel's arguments and comments: (1) that if the jury sentenced Petitioner to die, they would be committing the same act he committed and would be no better than he [R.2057, 2059]; (2) that Mississippi's death penalty scheme was in essence arbitrary because it permitted the imposition of death for the murder of a peace officer but not for the murder of

an ordinary citizen or child [R.2062, 2065]; (3) that in light of the Ten Commandments and the Christian faith, "there can't be some little man over there in the Legislature write a law and come in here and tell you you can kill this man," [R.2069]; (4) that some doubt existed as to whether defendant in fact killed the victim [R.2066–67]; (5) an attempt to describe the execution of defendant [R.2075]; and (6) repeatedly telling the members of the jury that "you are god" [R2076–77].

On direct appeal of this issue, 416 So.2d at 391–92, the Mississippi Supreme Court noted that "defense counsel should not be unduly restrained in his closing argument at the punishment state because this stage of the trial is for the purpose of determining whether a defendant will live or die." It reaffirmed a previous decision indicating that counsel may draw upon literature, history, religion, and philosophy for material for his argument, and refused to decide whether "argument is limited to mere facts in evidence adduced at this stage of the trial." Nevertheless, the court was of the opinion that the argument of defense counsel "clearly exceeded the legitimate field of closing argument." In the court's view, the remarks of counsel were designed to excite the passions or prejudices of the jury, and the arguments were in effect "an attack on the legislative enactment of the death penalty." One justice dissented on the grounds that the case fell within the principles of a prior state court decision. 416 So.2d at 393–396 (Opinion of Hawkins, J., dissenting).

■ On the instant habeas petition, we do not second guess the Mississippi Supreme Court's interpretation of the law of that state as applied to the facts before it, nor does a "mere error of state law" constitute cognizable grounds for a habeas corpus petition. *Engle v. Isaac,* 456 U.S. 107, 121 n. 21, 102 S.Ct. 1558, 1568 n. 21, 71 L.Ed.2d 783 (1982); *Seaton v. Procunier,* 750 F.2d 366, 368 (5th Cir.1985). Instead, this Court's review is limited to the question of whether fundamental constitutional rights of Petitioner were violated.

■ Neither the Petitioner nor the respondent has directed the Court's attention to any United States Supreme Court decision which squarely addresses the circumstances under which a restriction on closing argument of counsel in the sentencing phase of a capital murder trial may constitute a denial of fundamental fairness, nor has this Court been able to locate such authority. Under the rule announced in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the plurality opinion of Chief Justice Burger concluded that:

> The Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a *mitigating factor,* any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

438 U.S. at 604, 98 S.Ct. at 2964. (emphasis in original). *See generally Washington v. Watkins,* 655 F.2d 1346, 1371–76 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). Both *Lockett* and a later case, *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), involved situations where the sentencer in a capital death case was precluded as a matter of law from considering testimonial evidence of relevant non-statutory mitigating factors. This Court assumes for the purposes of this case that a preclusion of defense counsel from orally arguing to the sentencer statutory, or relevant non-statutory, mitigating factors within the meaning of the *Lockett-Eddings* rule could, in some circumstances, be so egregious as to render the sentencing phase fundamentally unfair.

Under the foregoing standard, we nevertheless find Petitioner's claim to be without merit.

The arguments of defense counsel to which the trial court sustained objections in the state were not directed towards relevant mitigating factors within the meaning of *Lockett.* Specifically, *Lockett* stressed

the need for individualized sentencing determinations based upon the consideration of "any aspect of a *defendant's character or record* and any of the *circumstances of the offense....*" See 438 U.S. at 602–605, 98 S.Ct. at 2963–65 (emphasis supplied); *see also, Zant v. Stephens,* 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235, 251 (1982). In *Lockett,* the court further added that:

> [n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record or the circumstances of the offense.

438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12. The Supreme Court decision in *Eddings* further emphasizes that the mitigating factors which may not be excluded from the sentencing authority are focused upon the particular background and characteristics of the person who committed the crime and the particular circumstances of the crime that was committed. 455 U.S. at 110–112, 102 S.Ct. at 874–75.

■ The arguments of counsel to which objections were sustained were not in fact addressed to, or relevant to, the particular background or character of the defendant or to the particularized factual circumstances surrounding the crime for which he was convicted—the murder of law enforcement officer J.T. Trest. Instead, the arguments of defense counsel in issue were directed on the whole to such generalized matters as an attempt to persuade the jurors that they would betray their religious beliefs if they "killed" defendant, an attack on the legislative scheme which classifies those categories of murder which are initially eligible for the imposition of the death penalty, and an attempt to describe an execution. Nothing in *Lockett* and its progeny even remotely suggests that the exclusion of such evidence, or a limitation of the argument of counsel regarding such matters, implicates the Constitution. *See, e.g., Shriner v. Wainwright,* 715 F.2d 1452, 1456 (11th Cir.1983) (trial court's exclusion of proffered evidence describing execution no violation of *Lockett*); *Young v. Zant,* 727 F.2d 1489, 1493 (11th Cir.1984) (trial court's exclusion of proffered evidence describing rehabilitative program in which defendant might be placed no violation of *Lockett*). On the contrary, *Lockett* specifically preserved the "traditional authority" of state courts to exclude matters not relevant to an individualized determination at the sentencing phase. Here, the state trial court, with the considered approval of the Mississippi Supreme Court, simply exercised this traditional authority in a manner not inconsistent with *Lockett* or the Constitution.[1] No constitutional error was committed.

■ Moreover, we note that the few comments and remarks of defense counsel to which the trial court sustained objections could not, in the context of counsel's argument in its entirety, be said to have rendered the sentencing phase fundamentally unfair or prejudicial to defendant. Contrary to the claims of Petitioner, defense counsel was in fact permitted to argue, either without objection by the prosecutor or by virtue of rulings of the trial court, a variety of philosophical and moral concerns regarding the imposition of the death penalty upon defendant. [R.2055–2058, R.2069–2072]. Without objection or interference by the trial court, defense counsel emphasized to the jury the gravity of the decision before it and the discretion it had in the matter, and further made both direct and indirect appeals for mercy. More to the point, defense counsel, without objection by the state, in fact argued to the jury relevant *Lockett* factors in mitigation of

---

1. Provided that the sentencing jury is given meaningful guidance in order to channel its discretion and that relevant evidence regarding the individual characteristics of the offender and his crime are not precluded from consideration, states are generally free to determine what factors may be relevant to a death penalty determination, *California v. Ramos,* 463 U.S. 992, 1000–01, 103 S.Ct. 3446, 3452–53, 77 L.Ed.2d 1171, 1180–81 (1983). In this case, the Mississippi Supreme Court indicated that defense counsel in the sentencing phase will be given broad, but not totally unbridled, freedom in closing argument. 416 So.2d at 392. From a constitutional standpoint, this middle-of-the-road approach is manifestly permissible.

the imposition of the death penalty[2] [R.2066, 2077–2078]. In addition, the jury was instructed, consistent with *Lockett*, that it could consider in mitigation various specific factors, and also

> [a]ny circumstance or combination of circumstances surrounding the life and character of Edward Earl Johnson, or the commission of the offense with which he is charged, that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life imprisonment.

It was further instructed that it could consider "any other matter" it deemed to be mitigating on behalf of the defendant [R.2008]. Given the foregoing, Petitioner did not suffer any prejudice of constitutional dimension.

In sum, Petitioner's claim in this regard is without merit.

### 2. *Trial Court's Failure to Give Lesser Included Offense Instruction.*

Petitioner contends that the trial court's failure to give a lesser-included-offense instruction based on Mississippi's "unlawful act" manslaughter statute[3] was constitutional error under *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). As outlined in his brief, Petitioner's theory in support of this claim is that Marshal Trest may have been engaged in an "unlawful act" when Petitioner shot and killed him.

At trial, Petitioner's attorneys submitted an instruction based on Mississippi's "heat of passion" manslaughter statute, *Miss. Code Ann.* § 97–3–35. This instruction was objected to by the state and refused by

the trial court[4] [R.1874, 2040]. No "unlawful act" manslaughter instruction was submitted by defendant to the trial court.

In this Court, the state urges, *inter alia,* that Petitioner is procedurally barred from litigating this claim because he failed to submit an "unlawful act" instruction at trial. *See Newell v. State,* 308 So.2d 71 (Miss.1975). While it is clear that Petitioner did not submit at trial the instruction which he now contends was required, in other respects the record is slightly confused. In his brief on direct appeal, the Petitioner argued in non-specific terms that a manslaughter instruction was required and concluded by noting that the "unlawful act" manslaughter instruction would be the correct instruction on remand. The refusal of the trial court to give the "heat of passion" instruction was mentioned but was not given any emphasis whatsoever. In its brief, the state contended that under *Newell* Petitioner had waived his right to argue that an "unlawful act" manslaughter instruction should be given. The state proceeded to argue that the trial court would have been justified in refusing such an instruction even if one had been offered. The entire emphasis of the Mississippi Supreme Court's opinion is directed toward the trial court's refusal to grant the "heat of passion" instruction, which it found not to be error. There is no direct mention or discussion of the "unlawful act" theory of manslaughter; however, the court did note that "there is absolutely no evidence that Trest sought to arrest or search appellant prior to the shooting." 416 So.2d at 387.

■■■ Where there is a default *at trial,* such as the failure to tender an instruction,

---

**2.** Evidence proffered in mitigation at the sentencing stage included the fact that defendant had no prior criminal record and that he was only 20 years of age. These circumstances were argued by defense counsel to the jury, along with the possibility that defendant might contribute to society if allowed to live. [R. 2059–2060; 2077–2078].

**3.** *Miss.Code Ann.* § 97–3–31 (1972) provides:
Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt

shall have failed, shall be guilty of manslaughter.

**4.** On direct appeal, the Mississippi Supreme Court ruled that this instruction tendered by defendant was deficient in that it omitted several material elements necessary under § 97–3–35 and that there was no evidence to support a "heat-of-passion" manslaughter instruction. 416 So.2d at 387–88. In his brief to this Court Petitioner basically concedes that the tendered instruction was deficient.

and the Mississippi Supreme Court relies upon that procedural default, this Court on habeas review will not excuse the default absent a showing of cause and prejudice. There is no allegation or showing of such cause and prejudice in the instant petition. *See Gray v. Lucas,* 677 F.2d 1086, 1109 (5th Cir.1982) (failure to request instruction at trial barred habeas review). However, where the state court has excused the procedural default occurring at trial level and entertained the issue on the merits, habeas review is not precluded. *Bass v. Estelle,* 705 F.2d 121 (5th Cir.1983). In this case, it is simply unclear as to whether the Mississippi Supreme Court relied upon the procedural default at trial or whether its brief reference to the lack of evidence regarding an illegal search or arrest constituted summary disposition on the merits regarding any "unlawful act" theory of manslaughter. Assuming that Petitioner's contention is not barred under *Gray, supra,* for his procedural default, for which no showing of cause and prejudice has been made, it is nevertheless clearly without merit.

In *Hooper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the Supreme Court clarified its ruling in *Beck* and held that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." 456 U.S. at 611, 102 S.Ct. at 2052 (emphasis in original). As the Court in *Hooper* pointed out, to give a lesser-included offense instruction where there is no evidence to support a conviction of the lesser offense may itself be constitutionally impermissible because it leads to arbitrary results in the imposition of the death penalty *Id.* *See also Jackson v. State,* 337 So.2d 1242, 1254–55 (Miss.1976) (lesser-included-offense instruction should not be given indiscriminately but only when warranted by the evidence).

■ Our review of the record indicates that there was no evidence whatsoever presented in the case which would have warranted an "unlawful act" manslaughter instruction under *Miss. Code Ann.* § 97–3–31. Petitioner did not testify at trial. The sole direct evidence of what occurred at the shooting, Petitioner's confession, offers absolutely no reasonable basis for the contention that Town Marshal Trest was in fact engaged in an "unlawful act" when the murder occurred. Petitioner's current theory that Trest was committing an illegal search or arrest without probable cause is based upon sheer speculation and conjecture, not evidence that was presented at trial. To the extent this claim is not procedurally barred, it fails on the merits.

3. *Alleged Discrimination in Composition of Grand Jury and Selection of Grand Jury Foreman*

The record reveals that Petitioner, through counsel, filed a pretrial motion on November 15, 1979, to quash the indictment on the basis of alleged racial discrimination in the composition of the grand jury and the selection of grand jury foremen. [R.15]. On November 16, defendant brought on his motion to quash for hearing. [R.157]. Petitioner sought to prove the allegations of the motion only through the testimony of Jimmy McMurry, the Circuit Clerk of Leake County for the previous 12 years. Upon questioning by Petitioner's attorney, McMurray estimated that approximately 35–40 percent of the total population of Leake County (20,000) was black and that approximately 60–65 percent was white. He testified that the percentages would remain the same with respect to the race of the 13,000 registered voters in Leake County. [R.158–160]. Approximately 200 jurors would be called for jury duty during each of the two terms of court held annually in Leake County. [R.163]. The Circuit Clerk further testified that he had been unable to comply with a subpoena duces tecum for jury lists issued at the instance of defendant's attorney and received by him the previous evening [R.164]. Defendant then sought to have the Court direct the Clerk to bring the jury list books in the courtroom and "tell us to the best of his ability how many on there are black and how many on there are white." [R.169]. Apparently because the jury list books had no racially-identifying code, the Circuit

Clerk testified that he could not make such identification even with the lists before him: "I can't do it, when I look I can't, unless I just personally know a fellow." [R.169]. The defendant then requested a three-day continuance on the hearing until the Clerk could produce the books. The trial judge noted that a subpoena was unnecessary, since the materials requested were public records and would be made available to defense counsel for examination at any time. [R.171]. While overruling that request for three days, the trial judge further ruled that the motion would be held in recess until the next morning to allow time for inspection of the records by counsel, provided that defense counsel made at least some initial effort by that time to search them. In response to the protestations of defense counsel that he would be unable to search the jury records by 10:30 the next morning, the trial judge made clear that he was requiring only an initial effort and that additional time would be made available by the court if necessary. [R.171–173; 188–190; 191–192]. Defense counsel then withdrew his motion for the additional time.

On further examination by the district attorney at the hearing, the Circuit Clerk testified as to the procedure utilized to select the grand jury both in that case and in the recent past. In essence, the jury commissioners utilized a random number to determine which individuals on certified voter registration books in the county would go into a jury wheel constituting the jury base. The jurors to be used for the particular term were then blindly pulled from the wheel and placed on a list in order. The first eighteen on the list were qualified and composed the grand jury. [R.174–180].

Prior to the close of the evidentiary portion of the hearing, it was stipulated after conference between the district attorney and defendant's counsel that the specific grand jury which indicted the Petitioner was composed of ten black and eight white members: four black males, four white males, six black females, and four white females. [R.181–182].

The trial judge ultimately set a special term for December 17, 1979, to try the case, and set a motion deadline for December 3, 1979. [R.250–251]. On the cut-off date, defendant's attorney filed a motion for production of grand jury lists from 1970 through 1979 [R.273], and also filed a "reinstated" motion to quash the indictment alleging race and/or sex discrimination in the composition of the grand jury. [R.275]. In essence, the motion alleged that since the jury lists for the past years had no racial identification for the individuals listed, the "only method" by which the defendant could hope to prove his allegations was to have the clerk "[sit] in the witness box, review each name and testify" or to prepare such testimony in advance. [R.277].

On December 6, 1979, the reinstated motions to quash and the motion to produce were heard. [R.304–306]. While formally denying the motion to produce, the trial judge nevertheless had ordered the clerk to bring the minutes of the court indicating the list of jurors who had served for the years requested, and these were made available to defendant's attorneys for their consideration. Moreover, the motion to quash, which sought to compel the clerk to testify as to the race of the jurors, was denied on the basis that it would necessarily involve guess work and conjecture.[5]

This court has carefully reviewed the record in connection with Petitioner's

---

5. In his ruling the trial judge stated:
   [T]o require the Circuit clerk to take the stand and testify under oath as to the race of a juror and the sex of a juror, he having previously testified in this same motion, would be to place him in a position of guesswork, conjecture, and would not be of benefit to this Court. I would not subject a person to taking

a list of jurors who have served twelve years ago and have him to be placed in a position of testifying under oath as to their sex or race.
   \*   \*   \*   \*   \*   \*
The information could be obtained by the attorneys in another way if they consider it important, other than requiring a witness to be placed in that position. [R. 304–305].

conclusory allegations in his petition that there was impermissible racial discrimination in the selection and composition of the grand jury which indicted him and finds his claims in this regard to be totally unsupported either in fact or in law.[6] In this context, we further observe that the trial judge, while anxious to avoid unnecessary delay gave Petitioner's attorney a reasonable opportunity to make a showing in this regard.

First, we note that absolutely no direct proof which would demonstrate the requisite purposeful discrimination regarding the composition of the grand jury which indicted Petitioner was presented. Moreover, the formula of circumstantial proof from which a prima facie case of purposeful discrimination in grand jury selection may be established, as set forth in *Castaneda v. Partitda*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), was not met. Under *Castaneda*, a criminal defendant making such a claim must prove, *inter alia*, a "substantial underrepresentation" of his race on relevant grand juries and must demonstrate the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve on the grand jury over a significant period of time," and must further demonstrate that the selection procedure is susceptible of abuse or is not racially neutral. 430 U.S. at 494, 97 S.Ct. at 1280. The statistical showing must be fine-tuned, *see Enriquez v. Procunier*, 752 F.2d 111, 115 (5th Cir.1984). Here, testimony elicited by Petitioner indicated that blacks comprised only an estimated 35–40 percent of the total population of Leake County, or in the alternative, the registered voters over 21, while it was undisputed that the November 1979 grand jury which indicted Petitioner was composed of ten blacks and eight whites. Thus, at least with respect to the grand jury that indicted Petitioner—which is all the proof that appears in the record—there was no "underrepresentation" of blacks whatsoever.

This salient fact, coupled with the existence and application in this case of a grand jury selection system in Mississippi which under state law is random at each stage of the selection procedure, *see Herring v. State*, 374 So.2d 784, 786 (Miss.1979) (summarizing state law procedures for grand jury selection[7]), forecloses Petitioner's claim. Mississippi's selection system is neutral on its face and utilizes random chance to select the initial base from which the prospective grand jurors are drawn, as well as to select the grand jurors from the pool, thereby avoiding any potential for abuse.

Similarly, the Court rejects Petitioner's contention that alleged discrimination in the selection of the foreman of the grand jury which indicted him requires his conviction to be set aside under *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). In *Rose*, the Supreme Court assumed "without deciding" that discrimination in the selection of a grand jury foreman would require a conviction to be set aside just as if discrimination had infected the selection of the entire venire. 443 U.S at 551–52 n. 4, 99 S.Ct. at 2997–98 n. 4. The Supreme Court ultimately held that the Petitioner in that case had failed to make out a prima facie case of discrimination. In the instant case, the *sole* evidence presented at hearing by Petitioner with respect to a prima facie case

---

6. Indeed, it is somewhat uncertain at this stage of the proceedings as to the extent petitioner continues to rely on this allegation. In its motion for summary judgment and brief, respondent treated this issue on the merits, rather than on simply a procedural basis. Unlike his response to other issues conceded by the state to be ripe on their merits, Petitioner has not addressed the grand jury composition in any detail.

7. *See Miss.Code Ann.* § 13–5–2, *et seq.* (Supp.), which was enacted in 1974 and became effective January 1, 1975. The preamble to these provisions declares that "[i]t is the policy of this state that all persons selected for jury service be selected at random from a fair cross-section of the population of the area served by the Court.... A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin or economic status."

was the Circuit Clerk's testimony that no black had served as foreperson of the grand jury in Leake County for the twelve years during which he had held office. No evidence whatsoever of the statistical probabilities inherent in this mere fact was demonstrated to the state courts or to this Court. There was no evidence, through the testimony of the other grand jurors or otherwise, that the white person who was ultimately appointed by the trial judge was unqualified or that the foreman was biased in any regard whatsoever. The grand jury itself, which consisted of ten blacks and eight whites, initially selected their own foreperson and indicated their selection to the trial judge. The trial judge approved and then appointed their selection. In terms of the instant case, this was not a situation where the grand jury selected a qualified black from their number who was then rejected by the trial judge in favor of a white.

Most importantly, in *Hobby v. United States*, 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), the Supreme Court added gloss to its prior decision in *Rose*. *Hobby* involved alleged discrimination in the selection of the foreperson of a federal grand jury. Specifically, the Supreme Court observed that *"Rose* must be read in light of the *method* used in Tennessee to select a grand jury and its foreman." 468 U.S. at ——, 104 S.Ct. at 3098, 82 L.Ed.2d at 268 (emphasis supplied). In this regard, the Court contrasted the manner of selecting the grand jury foreman in Tennessee with that in use in the federal system. First, the court noted that the grand jury foreman was appointed from the population at large to sit as the thirteenth voting member of the grand jury. In the federal system, by contrast, the foreman was appointed from the members of the grand jury:

> The federal foreman, unlike the foreman in *Rose*, cannot be viewed as the surrogate of the judge. So long as the grand jury itself is properly constituted, there is no risk that the appointment of any one of its members as foreman will distort the overall composition of the array

or otherwise taint the operation of the judicial process.

*Id.* In the instant case, we have held above that there was no evidence whatsoever that the grand jury was improperly constituted and have noted that Mississippi's selection procedure is random and neutral. As with the federal system, and unlike Tennessee, the foreman is appointed from the members of the panel. *See Herring v. State*, 374 So.2d 784 (Miss.1979).

Second, the Supreme Court observed that the administrative and investigative powers of the grand jury foreman in *Rose* gave him "virtual veto power over the indictment process" which stood "in sharp contrast to the ministerial powers of the federal counterpart, who performs strictly clerical tasks...." 468 U.S. at ——, 104 S.Ct. at 3098, 82 L.Ed.2d at 268. As construed by the state supreme court, the powers of the grand jury foreman in Mississippi, while not exactly identical to those of the foreman in the federal system, are far more restricted than that granted and utilized under Tennessee's system. 374 So.2d at 786–87. The susceptibility to abuse of Tennessee's system is not present.

For all of the foregoing reasons, we find that Petitioner's conclusory claim of discrimination in the selection of the grand jury panel and foreman to be without merit in this case.

### 4. *Lack of Prior Notice of Aggravating Circumstances.*

■ In paragraph 19 of the petition, Petitioner complains that he was not given prior notice of the aggravating circumstances upon which the prosecutor intended to rely in the sentencing phase. This issue was raised at trial, was not raised on appeal, but was revived on petition for error coram nobis, where the Mississippi Supreme Court held that the claim was procedurally barred, 449 So.2d at 1208. The circumstances of this case fall within our holding in *Edwards v. Thigpen*, 595 F.Supp. 1271, 1277–79 (S.D.Miss.1984), as discussed above, and the procedural bar

invoked on error coram nobis will not bar our consideration of this claim.

■ The Court finds Petitioner's contention regarding his alleged lack prior notice of aggravating circumstances upon which the state would rely to be without merit. *Miss.Code Ann.* § 99–19–101(5) sets forth and limits the aggravating circumstances upon which the state may rely. In *Spinkellink v. Wainwright*, 578 F.2d 582, 609–10 (5th Cir.1978), the Fifth Circuit summarily rejected the identical contention made by Petitioner here.

5. *Refusal of Trial Court to Give "No Parole" Instruction.*

■ Petitioner claims that the trial court violated his Eighth and Fourteenth Amendment rights by refusing to instruct the jury that it should presume that Petitioner would in fact spend the rest of his life in prison if a life sentence was imposed.[8] This instruction in effect requested the jury to disregard the possibility of pardon, parole, or clemency if it opted for life imprisonment rather than death. While such instructions, if accurately stated, may be permissible under the Constitution, they are not mandated by the Constitution. *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *O'Bryan v. Estelle*, 714 F.2d 365, 388–89 (5th Cir.1983). The substantive limitations imposed upon the capital sentencing process by the Supreme Court refer to the preclusion of individualized sentencing determinations and the injection of elements too speculative for the jury to consider. The "no parole" instruction does not implicate such substantive limitations, and the states thus remain free to make a choice regarding the advisability of such an instruction. *Ramos*, 463 U.S. at 1000–01, 1012–13, 103 S.Ct. at 3452–53, 3459, 77

L.Ed.2d at 1180–81, 1188–89. Mississippi has determined, along with a number of other states, *see* 463 U.S. at 1013 n. 30, 103 S.Ct. at 3459 n. 30, 77 L.Ed.2d at 1189 n. 30, that jury consideration of such matters is improper. *Bullock v. State*, 391 So.2d 601, 610 (Miss.1980) (instruction that jury presume that a defendant sentenced to life imprisonment will remain in prison for life improper and "calculated to confuse the jury"). On direct appeal in the instant case, the Mississippi Supreme Court reiterated this view. 416 So.2d at 390–391. Petitioner's claim presents no constitutional error and no ground for federal habeas relief.

6. *Failure of Trial Court to Define Aggravating Circumstances that Murder was "Heinous, Atrocious or Cruel."*

■ Petitioner further contends that the trial court failed, in violation of the Eighth and Fourteenth Amendments, to define or limit the terms "especially heinous, atrocious, or cruel" in instructing the jury regarding this statutory aggravating circumstance provided in *Miss.Code Ann.* § 99–19–101(5)(h). No instruction specifically defining those terms was offered or requested by defendant at trial, nor was this issue raised by him on direct appeal to the Mississippi Supreme Court. The failure of the trial court to define these terms in the instructions that were given to the jury was raised for the first time in the Petitioner's application for leave to file writ of error coram nobis. The Mississippi Supreme Court held the issue to be procedurally barred. 449 So.2d at 1209. Because Petitioner failed to request or submit a definition of these terms in an instruction at trial, this specific basis for his habeas

---

**8.** The tendered instruction provided:

In your deliberating on the question of punishment, you are to presume that if sentence Edward Earl Johnson to life imprisonment that he will spend the rest of his life in prison, and you are to presume that if you sentence Edward Earl Johnson to death that his execution will be carried out and he will die in the

gas chamber. You are to make no other presumptions regarding the aforesaid matter. [R. 2039].

The trial court permitted substantial argument in chambers by the prosecution and defense counsel concerning this instruction and ultimately refused to submit it to the jury. [R.1979–1986].

claim is barred.[9] *Gray v. Lucas,* 677 F.2d 1086, 1109 (5th Cir.1982) (failure to request instruction on lesser included offense at trial barred on habeas); *see also Bass v. Estelle,* 705 F.2d 121 (5th Cir.1983).

On application for error coram nobis review, the Mississippi Supreme Court further noted, however, that regardless of the procedural bar, it has addressed this assertion "numerous times already and found it without merit." [10] It is not clear to the Court whether this comment indicates that the state court directly addressed the merits of this issue in this particular case on error coram nobis, or whether it was generally intended to point out past rulings of the court in this area. We assume the former, i.e., that the issue was directly considered on its merits and constitutes an alternative holding of the state court. Accordingly, we give consideration to the merits of this issue on Petitioner's claim for habeas relief.

Our inquiry is guided by the decision of the Fifth Circuit in *Gray v. Lucas,* 677 F.2d 1086 (5th Cir.1982). In *Gray,* Petitioner argued that the aggravating circumstances found in his case, including that the murder was "especially heinous, atrocious or cruel" had been interpreted in an overly broad manner and had been applied inconsistently. The Fifth Circuit held that Mississippi had judicially placed a narrowing interpretation upon these terms and that the state had "consistently applied this factor to pitiless crimes which are unnecessarily tortuous to these victims." 677 F.2d at 1110–11. The Court further noted that the state supreme court, through its proportionality review, had indicated that a narrowing construction would continue to be applied. *Id.* Moreover, under *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the construction of an aggravating circumstance may not be so broad that it encompasses an impermissibly

large group of murderers so that it may be said that the sentence was the result of the standardless discretion of a basically uninstructed jury.

As given a limited judicial construction by the Mississippi Supreme Court, the terms "especially heinous, atrocious, or cruel" are not so vague and overbroad on their face as to violate the Eighth and Fourteenth Amendments under *Godfrey* and *Gray* standards. The Mississippi Supreme Court continues to define such aggravating circumstances as those which are "accompanied by such additional facts as to set the crime apart from the norm of capital felonies—*the conscienceless or pitiless crime which is unnecessarily tortuous to the victim,*" *Billiot v. State,* 454 So.2d 445, 464 (Miss.1984), *quoting, Coleman v. State,* 378 So.2d 640, 648 (Miss. 1979). *See also Jordan v. State,* 464 So.2d 475, 478 (Miss.1985); *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978).

As applied to the evidence presented at trial in this case, the utilization of the aggravating circumstances of "especially, heinous, atrocious, or cruel," as defined for appellate review purposes by the Mississippi Supreme Court, did not offend the Constitution. The instant homicide presents its own picture of a pitiless killing which stands in material contrast to that committed in *Godfrey,* where on the facts defendant killed his wife and mother-in-law with a single shot subsequent to a family dispute, the victims were not abused and did not suffer prior to an instantaneous death, and no other statutory aggravating circumstances were present. *See Barclay v. Florida,* 463 U.S. 939, 941 n. 5, 103 S.Ct. 3418, 3423 n. 5, 77 L.Ed.2d 1134, 1142 n. 5 (1983) (plurality opinion). Having disabled officer Trest by virtue of three shots in the torso with his .25 caliber pistol and a blow to the head, Petitioner nevertheless proceeded to take Trest's own .357 handgun

---

9. Because petitioner failed to raise this issue *at trial,* as well as on direct appeal, the holding of this Court in *Edwards v. Thigpen,* 595 F.Supp. 1271, 1277–79 (S.D.Miss.1984) is not applicable. See pp. 1127–28, *supra.*

10. In this regard the court cited *Washington v. State,* 361 So.2d 61 (Miss.1978) and *Coleman v. State,* 378 So.2d 640 (Miss.1979).

and, with Trest "moaning" and "moving" on the ground, shot him in the head with the magnum. These latter acts by Petitioner, taken at a time when he was in control of his unfortunate victim, gives this homicide overtones of a brutal and senseless execution. *See, e.g., Turner v. Bass*, 753 F.2d 342, 351–53 (4th Cir.1985). Our review of the trial record indicates that the initial barrage of small caliber shots fired at relatively close quarters struck Trest in the lung, the lower chest, and near the heart. These initial wounds caused substantial hemorrhaging in Trest's upper body. The pathologist testified that two of these small caliber wounds might ultimately have been fatal. [R.1294–1307]. Consistent with Petitioner's confession that Trest was "moaning" and "moving" at the time he took Trest's handgun, the pathologist testified that the officer was without question alive when the gunshot wound in the head was subsequently administered. The cause of death was the large caliber wound in the head from Trest's handgun; this shot entered the right ear and ranged downward into the spinal column, resulting in paralysis but not immediate death. According to the pathologist, Officer Trest would have remained conscious for approximately fifteen seconds from this wound and death would have occurred several minutes later.

Upon these particular facts, the minimum requirements as approved by the Fifth Circuit in *Gray v. Lucas*, supra, were met. Based upon our review of recent state court death penalty cases, the Court cannot say that a substantial inconsistency in the application of the aggravating factor has developed in other cases or that the state court's review of such issues is constitutionally flawed and unreliable. It is not overbroad on its face and was not applied in an unconstitutional manner in this case.

### 7. *Alleged Discriminatory Imposition of Death Penalty On the Basis of Race.*

Petitioner alleges that the death penalty in Mississippi has been discriminatorily imposed upon black persons and persons accused of killing whites. This issue was not raised before the trial court either by motion subsequent to the sentencing phase or by motion for new trial, nor was it raised upon direct appeal. On Petitioner's application for writ of error coram nobis, the Mississippi Supreme Court held this claim barred because of the foregoing procedural defaults. Because there is no showing or allegation by the Petitioner of cause and actual prejudice necessary to excuse such procedural defaults, this claim is accordingly barred in the instant habeas proceeding.[11] *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Bass v. Estelle*, 705 F.2d 121 (5th Cir.1983).

### 8. *"Arbitrary" Distinction Between Felony Murder and Premeditated Murder*

Petitioner asserts that Mississippi's death penalty scheme is arbitrary and unconstitutional because it permits the imposition of the death sentence for a conviction of felony murder while premeditated murder is punishable by life imprisonment. We agree with the Mississippi Supreme Court, 449 So.2d at 1208, that Petitioner has no standing to launch this attack. Petitioner was indicted and convicted under *Miss.Code Ann.* § 97–3–19(2)(a).

---

**11.** Moreover, even if this issue were not barred because of the default in state court, we note that petitioner's general allegation that the death penalty has been discriminatorily imposed upon blacks who have killed whites is totally lacking in merit and would afford no basis for federal habeas relief. First, and most importantly, there is no showing in this case of any specific acts of purposeful discrimination against the petitioner because of his race. Second, the statistical study now proffered, an unpublished manuscript entitled "Capital Sentencing in Mississippi," is insufficient in that it does not account for the various aggravating or mitigating circumstances that are present in the sentencing of capital crimes. *See Prejean v. Maggio*, 765 F.2d 482, 486–87 (5th Cir.1985); *Moore v. Maggio*, 740 F.2d 308, 322 (5th Cir.1984); *Smith v. Balkcom*, 671 F.2d 858 (5th Cir.1982). Finally, we add that the Mississippi Supreme Court conducted a proportionality review and determined that the jury verdict in petitioner's case was not the result of prejudice or passion. *Moore*, 740 F.2d at 320.

That particular subsection makes it a capital crime to "murder" a peace officer while the officer is "acting in his official capacity." Petitioner was not convicted under the subsection which makes "felony murder" a capital crime. *Miss. Code Ann.* § 97–3–19(2)(e). As the felony murder statute was not applied to Petitioner, he is in no position to assert its unconstitutionality or to rely on such cases as *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Moreover, with respect to the statute under which Petitioner was convicted, we note that the jury was instructed at the guilt phase as to the constituent elements of the particular capital murder at issue [R.1995]. We further add that in light of the "special interest" in affording protection to law enforcement officers, the state's inclusion of Section 19(2)(a) as a category of murder for which the death penalty may be imposed can in no manner be termed arbitrary where, as here, any mitigating circumstances may be considered at the sentencing phase. *See, Roberts v. Louisiana,* 431 U.S. 633, 636–38, 97 S.Ct. 1993, 1995–96, 52 L.Ed.2d 641–42 (1977).

9. *Failure of Trial Court to Define "Burglary" and "Attempted Rape" in Instructions to Jury at Sentencing Phase.*

Subsequent to the Mississippi Supreme Court's May 1982 affirmance of Petitioner's conviction and sentence, the initial petition for habeas relief was filed in this Court on October 27, 1982. That petition contained both exhausted and unexhausted claims. Accordingly, on January 12, 1984, the Court dismissed the petition without prejudice and permitted Petitioner to return to state court to exhaust those unexhausted claims. As noted previously, the Petitioner then filed an application for leave to file a petition for writ of error coram nobis in the Mississippi Supreme Court. In May 1984, that application was denied. In June 1984, the petition was re-filed in this Court, along with a motion for stay of execution. The execution was stayed.

On October 4, 1984, the Petitioner filed a motion for leave to amend his petition to include a new claim. The proposed amendment to the petition provided:

> After the sentencing phase of Petitioner's state trial proceedings, the State of Mississippi obtained an instruction that the jury could consider as an element of aggravation in determining whether the death penalty should be imposed that "the capital offense was committed while the defendant was in flight after committing the crime of burglary or attempted to commit the crime of rape." The trial Court provided no instructions to the jury defining the elements of burglary or attempted rape. The failure to define the elements of these crimes was plain error and violated Petitioner's right to due process of law as secured by the Fourteenth amendment to the United States Constitution. Attempted exhaustion of this constitutional claim in the Mississippi Supreme Court system would be futile.

On October 19, 1984, the Court granted Petitioner's request for leave to amend in order to permit initial consideration of the claim along with the rest of the petition, and the parties were ordered to submit supplemental memoranda directed to this issue.

On the merits Petitioner contends that the trial court's failure on its own motion to instruct the jury *at the sentencing phase* as to the constituent elements of the aggravating factor set forth in *Miss. Code Ann.* § 99–19–101(5)(d) violated Petitioner's constitutional rights. That aggravating circumstances provides:

> The capital offense was committed while the defendant was engaged ... in the commission of, or an attempt to commit, *or flight after committing or attempting to commit* any robbery, *rape,* arson, *burglary,* kidnapping....

(emphasis supplied). At the sentencing phase the jury was instructed that it was to:

Consider only the following elements of aggravation in determining whether the death penalty would be imposed:

(1) The capital offense was committed while the defendant was in flight after committing the crime of burglary or attempting to commit the crime of rape.

(2) The capital offense was especially heinous, atrocious or cruel.

You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exists in this case to return the death penalty. If none of those elements are found to exist the death penalty may not be imposed....

As noted above, the capital offense for which Petitioner was convicted at the guilt phase was the murder of a law enforcement officer who was performing his official duties. Petitioner, relying upon such cases as *Bell v. Watkins*, 692 F.2d 999, 1005–06 (5th Cir.1982) and *United States v. Williams*, 463 F.2d 958 (D.C.Cir.1972), contends that the failure to instruct the jury "as to the constituent elements of the crime with which the defendant is charged" is fundamental error and a denial of due process.

For reasons set forth below, important considerations regarding the nature of federal habeas relief militate strongly against reaching the merits of this claim, *see Engle v. Isaac*, 456 U.S. 107, 126–30, 102 S.Ct. 1558, 1571–73, 71 L.Ed.2d 783 (1982), and the Court declines to do so.

■■■ We observe that Petitioner's argument presents a colorable constitutional claim. The Court is constrained to note in passing, however, that Petitioner's argument, plausible at first blush, is not without stumbling blocks. First, *at the guilt phase*, Petitioner was convicted of murdering a law enforcement officer. It was for the commission of this capital offense, for which the jury was fully instructed, that Petitioner was made initially eligible for the imposition of the death penalty at the sentencing phase. Both *Bell* and *Williams*, relied upon by Petitioner, dealt with the failure to instruct as to the elements of

a crime at the guilt phase, rather than at sentencing. *Bell* in fact held such error to be harmless under the circumstances of that case. Second, as the Supreme Court has made clear, there are fundamental distinctions between the nature of the determination at the guilt phase and at the sentencing phase. At the guilt phase, the jury in returning a conviction must be satisfied that the elements of the capital offense have been proved beyond a reasonable doubt, whereas sentencing decisions "rest on a far reaching inquiry into countless facts and circumstances and not on the type of proof that returning a conviction does." *California v. Ramos*, 463 U.S. 992, 1008 n. 21, 103 S.Ct. 3446, 3456 n. 21, 77 L.Ed.2d 1171, 1185 n. 21 (1983). Third, it appears that the evidence in the case generally supported and made appropriate a basic instruction at the sentencing phase as to the aggravating circumstance of whether defendant was in flight after committing a burglary or attempting to commit a rape. *See Parker v. Procunier*, 763 F.2d 665 (5th Cir.1985); *Seaton v. Procunier*, 750 F.2d 366 (5th Cir.1985). In our view, the precise issue is whether the failure of the trial judge to define "burglary" and "rape" under these circumstances made the imposition of the death penalty the product of a "standardless and unchannelled" discretion by a jury that was "basically uninstructed." *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). We further note in this context that an additional aggravating circumstances was relied upon by the state and found by the jury. *See Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1982).

■■ In the state courts, however, Petitioner failed to preserve the alleged error at any stage of those proceedings. Most importantly, he did not object to this particular facet of the sentencing instruction at trial, nor was it raised on direct appeal or on application for writ of error coram nobis after this Court had dismissed the initial petition without prejudice. Under typical circumstances, the failure of Petitioner to make at least an initial presentation of this claim to state courts would require dismis-

sal of this petition as a "mixed" one under the exhaustion requirements of *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). The circumstances here, however, are not typical. As noted above, a previous petition has already been dismissed once as "mixed" under *Rose*. Any attempt at further exhaustion of this claim would be futile, as state collateral relief through yet another application for writ of error coram nobis is unavailable at this stage of the proceedings. Mississippi currently provides only limited colateral post-conviction review. *Smith v. State*, 434 So.2d 212, 215 (Miss.1983); *Pruett v. Thigpen*, 444 So.2d 819, 822–23 (Miss.1984); *see also Engle v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 1570 n. 28, 71 L.Ed.2d 783 (1982). Accordingly, since state collateral relief is unavailable, Petitioner is deemed to have exhausted his state remedies with respect to this claim. Moreover, to dismiss under *Rose* for further attempted exhaustion of this claim would make a subsequent petition subject to dismissal by this Court as a successive petition. *See Rudolph v. Blackburn*, 750 F.2d 302, 305 (5th Cir.1984).

Most importantly, as the Supreme Court decision in *Engle* makes clear, the exhaustion of state remedies is a separate issue from the more fundamental issue of waiver. 456 U.S. at 125 n. 28, 102 S.Ct. at 1570 n. 28. With respect to the issue of waiver and procedural default, a Petitioner who is deemed to have exhausted his state remedies must nevertheless make a threshold demonstration in this Court of "cause and actual prejudice" to explain the default before federal habeas relief may be obtained. *Engle*, 456 U.S. at 129, 102 S.Ct. at 1572; *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Petitioner did not request a definition of "rape" and "burglary" in the submitted instruction at the sentencing stage of the state trial, nor did he otherwise object to the instruction on this ground at any stage of the proceedings. See pp. 1127–28, *supra*. There is no showing or allegation in this case of "cause and actual prejudice" required under these circumstances, nor does a contention that

"plain error" has occurred meet that standard. *Engle, supra*, 456 U.S. at 130–35, 102 S.Ct. at 1573–75. Accordingly, we find that Petitioner is barred from asserting this claim in a federal habeas corpus proceeding.

## CONCLUSION

In conclusion, our review of the petition and record indicates that all of Petitioner's claims are either procedurally barred or without constitutional merit. Where the merits have been appropriately addressed, we find that Petitioner's conviction of capital murder did not offend the Constitution and that as a matter of law none of the claimed errors in the sentencing phase rendered those proceedings fundamentally unfair or implicated the substantive limitations imposed by the Constitution in such cases. Moreover, as the state court record has provided a complete and adequate basis for review, no evidentiary hearing is required.

Accordingly, the State's Motion to Dismiss is sustained and it is ordered that the Petition for habeas corpus relief is denied. The stay of execution issued by this Court on July 5, 1984, is hereby vacated. A separate judgment will be entered in accordance with this Opinion and Order.